1

Honorable Barbara J. Rothstein

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

DONALD TIMM, an individual; REED
WIMAN, an individual; and PERIPHERY
NEUROPHYSIOLOGY, a foreign limited
liability company,

NO.  2:24-cv-01570-BJR

9

SECOND AMENDED COMPLAINT

10

Plaintiffs,

11

vs.

12

SEATTLE CHILDREN'S HOSPITAL, a
Washington non-profit corporation; THE
ASSOCIATION OF CHRMC AND
UNIVERSITY PHYSICIANS (d/b/a
CHILDREN'S UNIVERSITY MEDICAL
GROUP), a Washington non-profit
Corporation; JEFFREY G. OJEMANN, M.D.,
an individual; SAMUEL BROWD, M.D., an
individual; JONATHAN PERKINS, D.O., an
individual; THE ASSOCIATION OF
UNIVERSITY PHYSICIANS (d/b/a UW
PHYSICIANS), a Washington non-profit
corporation; PETER C. ESSELMAN, M.D.;
and GREGORY KINNEY, PH.D., an
individual, and STATE OF WASHINGTON,
through the University of Washington School
of Medicine and University of Washington
Medicine, d/b/a UW Medicine, entities of the
STATE OF WASHINGTON,

13

14

15

16

17

18

19

20

21

22

Defendants.

23

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    Plaintiffs, by and through their attorneys of record, STRITMATTER KESSLER

2    KOEHLER MOORE and ERIC SIEGEL LAW, PLLC, and for causes of action against

3    Defendants, allege as follows:

4    **INTRODUCTION**

5    1.    Through their company, Plaintiff Periphery Neurophysiology, LLC, Plaintiffs

6    Donald Timm and Reed Wiman contracted with Defendant Seattle Children's Hospital ("SCH"

7    or "the Hospital") to provide intraoperative monitoring services to the Hospital.  The Hospital

8    agreed to supply oversight providers for those services who were duly licensed and qualified.

9    Instead, through the University of Washington and its affiliates, the Hospital provided unlicensed

10   and unqualified oversight providers (who held Ph.D.'s instead of medical degrees).  When

11   Plaintiffs reported their concerns regarding these unlicensed medical providers and identified

12   threats to patient safety as well as actual injuries to patients caused by the unlicensed providers,

13   the Hospital failed to investigate or address their concerns.  Instead, the Hospital brought in

14   another vendor who was willing to work with the unlicensed providers, and decided not to renew

15   the contract held with Plaintiffs, despite being deemed best qualified and at the final stage of the

16   contract renewal process.

17   2.    This is an action for damages and other relief resulting from these unlawful

18   actions.

19   **PARTIES**

20   3.    Plaintiff Donald Timm ("Plaintiff Timm" or "Mr. Timm") is a resident of the

21   State of Washington.  He is one of two members / owners of Periphery Neurophysiology, LLC.

22   4.    Plaintiff Reed Wiman ("Plaintiff Wiman" or "Mr. Wiman") is a resident of the

23   State of Washington.  He is one of two members / owners of Periphery Neurophysiology, LLC.

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

5.    Plaintiff Periphery Neurophysiology, LLC ("Periphery" or "the Company") is a limited liability company organized under the laws of the State of New Hampshire.  Its principal place of business is in the State of Washington.  At all times relevant to this action, Periphery provided contracted healthcare services for intraoperative neurophysiologic monitoring.

6.    Defendant Seattle Children's Hospital ("SCH" or "the Hospital") is a non-profit corporation organized under the laws of the State of Washington.  Its principal place of business is 4800 Sand Point Way, NE, Seattle, Washington, 98105.

7.    Defendant The Association of CHRMC and University Physicians, d/b/a/ Children's University Medical Group, (hereinafter "CUMG") is a non-profit corporation organized under the laws of the State of Washington.  Its principal place of business is 4500 Sand Point Way, NE, Suite 100, Seattle, Washington, 98105.  CUMG is a pediatric group practice that was established to support the academic, research, and clinical missions of its corporate members, University of Washington Medicine ("UW Medicine") and SCH.

8.    Jeffrey G. Ojemann, M.D., is a resident of the State of Washington.  At all times relevant to this action, he was either an employee or agent of CUMG.

9.    Samuel Browd, M.D., is a resident of the State of Washington.  At all times relevant to this action, he was either an employee or agent of CUMG.

10.    Jonathan Perkins, D.O., is a resident of the State of Washington.  At all times relevant to this action, he was either an employee or agent of CUMG.

11.    The State of Washington is a duly authorized state and governmental entity who acted and conducted business by and through its departments and agencies, including but not limited to the University of Washington, University of Washington Medicine d/b/a UW Medicine, and the University of Washington School of Medicine (collectively referred to as

SECOND AMENDED COMPLAINT - 3

1   "UW" or "the State"). To the extent such agencies are independent entities and not departments,

2   agencies or units of the State of Washington, they are named as Defendants separately.  The

3   State has acted by and through the actual or apparent authority of its agents, employees and/or

4   contractors.  All acts and conduct of the employees, agents and contractors of the State were by

5   and on behalf of Defendant State of Washington for which the State of Washington is legally

6   liable on the basis of employer/employee, respondeat superior, vicarious liability and/or agency

7   or apparent agency authority.

8        12.    The Association of University Physicians, d/b/a UW Physicians, (hereinafter

9   "UWP") is a non-profit corporation organized under the laws of the State of Washington.  Its

10   principal place of business is 701 Fifth Avenue, Suite 700, Seattle, Washington 98104.  UWP is

11   the practice group for more than 2,600 providers and other healthcare professionals associated

12   with UW Medicine who care for patients throughout the region.  These providers teach at the

13   University of Washington Medical School and practice medicine at UW Medicine facilities,

14   including SCH.

15        13.    Peter C. Esselman, M.D., is a resident of the State of Washington.  At all times

16   relevant to this action, Dr. Esselman was the Chair of the Department of Rehabilitation Medicine

17   at the University of Washington Medical Center.  At all times relevant to this action, he was

18   employed by UWP.

19        14.    Gregory Kinney, Ph.D. is a resident of the State of Washington.  At all times

20   relevant to this action, Mr. Kinney was the Director of the Neuromonitoring Program with the

21   Department of Rehabilitation Medicine at the University of Washington.    At all times relevant

22   to this action, he was employed by the University of Washington and by extension contracted to

23   provide services to SCH.

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

15.     Pursuant to Rev. Code Wash. § 4.92.110, Plaintiffs have filed a notice of claim as to the University of Washington, University of Washington Medicine, and the University of Washington School of Medicine, which also includes UWP, Defendants Esselman and Kinney, relating to the events alleged in this complaint.  Plaintiffs have fully complied with all obligations under Rev. Code Wash. § 4.92 *et seq.*

## JURISDICTION AND VENUE

16.     Pursuant to Rev. Code Wash. § 2.08.010, this Court has subject matter jurisdiction over Plaintiffs' claims because the amount in controversy exceeds three hundred dollars, and subject matter jurisdiction has not been by law vested exclusively in another court.

17.     This Court has subject matter jurisdiction over Plaintiffs' claims under the (federal) False Claims Act, 31 U.S.C. § 3730(h), because state courts have concurrent jurisdiction of claims brought under this section.

18.     This Court has personal jurisdiction over all defendants because they all reside in the State of Washington and/or conduct business in the State of Washington.

19.     Pursuant to Rev. Code Wash. § 4.12.020, venue is proper because the incidents giving rise to these causes of action occurred in King County, Washington.

## FACTUAL ALLEGATIONS

20.     Mr. Timm and Mr. Wiman formed Periphery on or around August 22, 2019 to provide services for intraoperative neurophysiologic monitoring ("IONM").

21.     Intraoperative neurophysiological monitoring refers to a group of procedures (or studies) used to identify and monitor the neural pathways of a patient during surgery in order to prevent damage to the nervous system.  IONM is commonly used during certain neurological, orthopedic, peripheral nerve, and vascular surgeries that have the potential to interfere with, and

SECOND AMENDED COMPLAINT - 5

1    cause permanent damage to, the integrity of a patient's neural structures.  IONM allows for the

2    earliest possible intervention, and surgical adjustment, to avoid neurological damage occurring

3    during surgery.

4            22.    Functionally, IONM involves the performance of two roles – those of a

5    neuromonitoring technologist and a supervising professional.  The technologist, who is trained in

6    physiological monitoring techniques (such as electroencephalography, electromyography, and

7    evoked potentials, among others), performs the patient setup, runs the modalities, and acts as a

8    liaison for the interpreting professional.  The supervising professional supervises the work of the

9    technologist, interprets the data in real time, communicates any significant findings to the

10   surgeon (directly or through the technologist), and provides diagnostic, therapeutic, and

11   interventional recommendations to the surgeon and other members of the patient care team, such

12   as the anesthesiologist.  The supervising professional is also responsible for writing post-

13   operative reports regarding the IONM data collected during the procedure.

14           23.    Mr. Timm are Mr. Wiman are both certified surgical neurophysiologists.  Because

15   Mr. Timm and Mr. Wiman were both technologists, in providing services through their

16   company, they intended to contract with licensed professionals to provide the "professional" or

17   "oversight" component or IONM.

18                    **Periphery Contracted with Seattle Children's Hospital**

19           24.    After forming Periphery, Mr. Timm learned that SCH was urgently seeking a new

20   IONM contractor.  Because Mr. Timm worked as a surgical neurophysiologist at the University

21   of Washington from 2013 to early 2018, he knew from his own experience that for a period of

22   nearly twenty-five years, SCH's contractor for IONM services had been the University of

23   Washington ("UW"), which provided both technologist and professional services through the

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1  Division of Neurophysiology within its Department of Rehabilitation Medicine.  The Director of

2  the program was Gregory Kinney, Ph.D.  Mr. Timm was also aware that UW's IONM program

3  had long experienced staff attrition issues.

4     25.    Mr. Timm reached out to SCH about its IONM services, and discussions began in

5  earnest in March 2020.  Renelle Risley, SCH's Director of Business Operations for Surgical and

6  Periop Services, organized a meeting for Mr. Timm to discuss Periphery's proposal and clinical

7  aspects of IONM with Ms. Risley, Dr. Jeffrey Ojemann (Surgeon-In-Chief at SCH), and Dr.

8  Jennifer Bauer (Chief of Spine Surgery at SCH).  During the meeting, SCH's physician

9  leadership openly vented their frustrations with the UW providers, complaining that UW did not

10  have enough people to handle its caseload and that, on occasion, the people it did have would fail

11  to show up for scheduled procedures.  SCH's leaders indicated that it wanted to replace UW

12  completely as its vendor.

13     26.    Discussions between Periphery and SCH continued throughout the summer of

14  2020 (slowed by the pandemic of COVID-19).  Eventually, in contrast to what it told Mr. Timm

15  initially, SCH communicated that it only wanted to utilize Periphery as a "backup" or "overflow"

16  provider of technologist services for IONM.  When its services were needed, Periphery would

17  work under the professional supervision of the UW.

18     27.    Given the intensity of the internal dissatisfaction with UW during the March 2020

19  meeting, Mr. Timm was surprised that SCH wanted to retain UW as its contractor.  But, for

20  Periphery, the arrangement would reduce the costs of contracting with professional oversight

21  providers as well as the liability risks associated with their services, which were often significant.

22  It would also give Periphery, a new company, time to scale up its services for other contracts.

23  Mr. Timm was also looking forward to working with his former colleagues at UW.

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

28.     He indicated the arrangement would be fine with Periphery, but when SCH

reached out to Mr. Kinney and the Chair of the Department of Rehabilitation Medicine, Dr. Peter

Esselman, there was no immediate response.  UW subsequently communicated that it did not

wish to provide oversight services for Periphery's technologists, which Ms. Risley passed along

to Mr. Timm.  Neither SCH nor anyone at UW ever explained the basis of this decision to Mr.

Timm.

29.     Nonetheless, Mr. Timm began the process of seeking oversight professionals who

would contract with Periphery so that it could obtain the contract with SCH.

30.     On or around September 15, 2020, Periphery and SCH entered into a formal

"Clinical Services Agreement for Surgical Neuromonitoring Services" (hereinafter, "the

Agreement").  Under the Agreement, Periphery agreed to provide "overflow" IONM services to

SCH.  Given UW's refusal to collaborate with Periphery, Periphery was anticipating that it

would be providing its own oversight services.  But the Agreement nonetheless provided that

either Periphery or SCH could provide an "Interpreting Practitioner" for procedures in which

Periphery was providing the technologist.

31.     In terms of qualifications, Section 2.1 of the Agreement stated:

Periphery shall be fully responsible for ensuring that each Periphery Provider
providing Services [defined to mean either a technologist or Interpreting
Practitioner] satisfies the following general qualifications at all times, in active
and good standing status, without any restrictions, conditions, suspensions,
reprimands, sanctions or disciplines (summarily or otherwise): (i) valid and
unrestricted licensure, accreditations, certifications, and clinical privileges
necessary to furnish the Services at Facilities; (ii) active enrollment and eligibility
with respect to all state and federal health care programs; and (iii) demonstrated
competency to provide the Services in a timely, safe, and effective manner in
accordance with applicable ethical and professional standards.

32.     Additionally, Periphery's providers were required to meet the "specific

qualifications" set out in Exhibit A of the Agreement.  In Exhibit A, Paragraph 3(a) stated, "In

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    addition to ensuring the qualifications under Section 2.1," Periphery technologists had to possess

2    certain credentials.

3        33.    Paragraph 3(b) made clear that any Interpreting Practitioner "supplied by

4    Periphery *or Seattle Children's* (employed or contracted) shall meet the *same* qualifications and

5    criteria" (both italics added).  Thus, among other requirements, Interpreting Practitioners

6    (whether they were supplied by Periphery or SCH) had to meet the requirements of Section 2.1

7    of the Agreement, including its basic licensing and eligibility requirements "with respect to all

8    state and federal health care programs."

9        34.    Section 8.3 of the Agreement stated: "The parties intend this Agreement to

10   comply with all laws, regulations and requirements applicable to physicians, hospitals, Medicare

11   and Medicaid participants, and healthcare professionals in general."

12       35.    From the execution of the Agreement to the end of the year, Periphery provided

13   services for fifteen surgical procedures, a number that was consistent with projections between

14   the parties.  With the exception of one procedure, in which SCH provided professional oversight

15   by one of its own neurologists, Periphery contracted for professional licensed oversight.[1]

16       36.    After years of difficulties with UW IONM services, SCH administrators and

17   surgeons alike were very pleased with Periphery's services and reliability.  In an email to Mr.

18   Timm, dated December 10, 2020, Dr. Ojemann wrote, "Our docs have been incredibly happy

19   with the responsiveness and, more importantly, the quality."  In an email to Mr. Timm, dated

20   December 14, 2020, Ms. Risley stated, "You and your team have been a savior!!!"

21

22

23        [1] Eventually, Mr. Timm was able to secure a contract with Real Time Neuromonitoring
     Associates ("RTNA"), the leading national telemedicine practice group.
24

SECOND AMENDED COMPLAINT - 9

37.     Meanwhile, during this time, the IONM services provided by UW continued to be plagued by staffing issues.  In or around early January 2021, UW gave 180-day notice that it intended to terminate its own contract with SCH to provide IONM services.  Accordingly, UW would only be providing such services until the summer of 2021.

38.     On or about January 14, 2021, Ms. Risley contacted Mr. Timm and asked if Periphery would expand its role so that it was providing all such IONM services.  Mr. Timm confirmed that Periphery would be willing to take on this larger role at the Hospital.  Because a provision of the Agreement precluded the parties from terminating the contract and entering into an agreement that was "substantially the same" during the first year of the Agreement, Periphery continued to provided services under the Agreement.

### Mr. Timm Discovered and Reported That UW's Ph.D. Oversight Providers Were Unlicensed and Providing Oversight Services in Violation of State Law.

39.     Shortly thereafter, on or about January 21, 2021, UW notified SCH that it could not even cover the majority of its remaining scheduled IONM procedures during the 180-day contract termination period, effectively defaulting on its contract with the Hospital.  As a result, many of the procedures scheduled for UW were transitioned to Periphery much sooner than anticipated.

40.     As cases were abruptly transitioned, a few SCH surgeons insisted on continuing to use the UW providers for oversight rather than having Periphery contract with its oversight providers.  A group of otolaryngology surgeons, including Randall Bly, MD; John Dahl MD; and Jonathan Perkins, DO (who was also Chief of the Vascular Anomalies Program), were particularly adamant, as was Samuel Browd, MD, a neurosurgeon.  Dr. Ojemann (Surgeon in Chief, SCH) supported the position of these surgeons, expressing a desire to use the UW's oversight services for select surgical procedures in which having an onsite person was "ideal."

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

41.     This position was bizarre.  For one thing, to this point the UW providers had refused to collaborate with Periphery by providing oversight services.  For another thing, although most of Periphery's oversight providers were not located in Seattle but provided their services remotely (which was entirely consistent with the industry standard), there was no benefit to having oversight providers "on site" for specific procedures.

42.     The otolaryngology cases at issue were typically "single-modality" (electromyography) procedures, as compared with the "multi-modality" procedures used in surgeries involving complex brain tumors.  Yet, the neurosurgery team at the Hospital had been using Periphery (and its contracted oversight providers) for complex brain tumors since the previous October (2020) without incident.  Moreover, from his experience working at UW, Mr. Timm knew that the UW Ph.D.'s themselves did 90% of their own interpretation and supervision cases remotely and were typically only on-site for more complicated procedures. [2]

43.     Mr. Timm explained these points to SCH, but he encountered strong resistance, and it became clear that the Hospital would require Periphery to provide technologist services with the UW Ph.D.'s as the professional oversight providers.

44.     When Mr. Timm initially agreed to have Periphery provide more than "overflow" technologist services, he was not aware that in some cases the UW Ph.D.'s would be providing this oversight.  He became concerned about the risks of the arrangement since Periphery had agreed to provide technologist services subject to *lawful* oversight; he was also concerned about potential liability to Periphery in this arrangement.

_____

[2] More generally, it would typically be incomprehensible for a contractor to give 180-day notice of termination for an agreement, default on it less than two months later, and still be allowed to continue a business relationship in any capacity.  The incident worried Mr. Timm, as it suggested the influence that physicians affiliated with UW, including the otolaryngologists, had over decisions at SCH.

SECOND AMENDED COMPLAINT - 11

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

45.    Mr. Timm had a sense of the regulatory and compliance aspects of the professional oversight function since he had looked into them when he was negotiating with RTNA in the fall of 2020.  Now, as a matter of prudence, he felt that he should make further inquiries and verify that the UW Ph.D.'s had the necessary qualifications and credentials to provide professional oversight to the technologists in his own company.

46.    As he began to discuss the issue with industry colleagues and did his own research, he came to realize something very disturbing.  He discovered that the UW Ph.D.'s were not authorized by the State of Washington to provide the services they were providing and, in fact, were providing them in violation of state law.

47.    Washington state law states that "[n]o person may practice or represent himself or herself as practicing medicine without first having a valid license to do so."  Wash. Rev. Code § 18.71.021.  State regulations provide for such licensing through the Washington Medical Commission.  Wash. Admin. Code § 246-919-010 *et seq*.  Washington law states that a person is engaged in the practice of medicine if he or she "[o]ffers or undertakes to diagnose, cure, advise, or prescribe for any human disease, ailment, injury, infirmity, deformity, pain or other condition, physical or mental, real or imaginary, by any means of instrumentality."  Rev. Code Wash. § 18.71.011.

48.    Oversight providers are engaged in the practice of medicine because they make autonomous clinical decisions to diagnose injuries to and ailments in a patient's neural structure occasioned by surgery, and make treatment recommendations to avoid, address, and cure those injuries and ailments by advising a surgeon and other licensed physicians.  In simplest terms, they diagnose an anesthetized patient's neurological status during surgery and advise surgical

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1   staff based on those diagnostic interpretations.  They also independently author clinical reports

2   on their intraoperative findings and oversee technologists.

3        49.    The interpretation of IONM studies is analogous to radiology, in which licensed

4   physicians (typically radiologists) diagnose and make treatment recommendations to other

5   physicians by interpreting radiological studies performed by non-physician technical personnel.

6   One critical difference, however, is that interpretation of IONM diagnostic studies occurs in real-

7   time during surgery.

8        50.    The conclusion that the interpretation and supervision of IONM is the practice of

9   medicine is consistent with the opinions of other regulatory and professional bodies.  The

10  American Medical Association ("AMA") has determined that the "supervision and interpretation

11  of intraoperative neurophysiologic monitoring constitutes the practice of medicine."  AMA

12  Policy H-410.957.  Although the AMA policy states that this practice "can be delegated to non-

13  physician personnel who are under the direct or online real time supervision of the operating

14  surgeon or another physician trained in, or who has demonstrated competence in,

15  neurophysiologic techniques and is available to interpret the studies and advise the surgeon

16  during the surgical procedures," the UW Ph.D.'s were *never* under the supervision of the SCH

17  operating surgeon or of any physician at UW (whether trained or competent in neurophysiologic

18  techniques) while they provided oversight services.

19       51.    Additionally, further substantiating that the UW Ph.D.'s were engaged in the

20  "practice of medicine," the FDA had approved the devices used by the technologists at Periphery

21  (and SCH) as Class II devices with a "prescription use" designation, meaning that they could

22  only be used under the supervision of a licensed provider.  *See* 21 C.F.R. § 801.109 (defining

23  "prescription device" as a "[a] device which, because of any potentiality for harmful effect, or

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    the method of its use, or the collateral measures necessary to its use is not safe except under the

2    supervision of a practitioner licensed by law to direct the use of such device").

3        52.    Although they were engaged in the practice of medicine, none of the UW Ph.D.'s

4    held licenses to practice medicine in the State of Washington.

5        53.    The State of Washington does provide numerous "exemptions" for healthcare

6    activities whose roles otherwise fall into the broad definition of practicing medicine.  This

7    includes dentists, chiropractors, podiatrists, nurses, physician assistants, medical students, and

8    medical residents, among others.  Rev. Code. Wash. § 18.71.030.  The State authorizes and

9    carefully defines the "scope of practice" for these healthcare activities.

10        54.    In the State of Washington, as in a number of other states, the only other

11    healthcare professional for whom the supervision and interpretation of IONM is within the scope

12    of practice is a licensed audiologist.  *See* Wash. Admin. Code § 246-828-095.  The State has not

13    provided a scope of practice for doctorates of philosophy (Ph.D.'s) to provide the professional

14    component of intraoperative monitoring.

15        55.    For years, Mr. Timm had trusted that the UW would be complying with all state

16    and federal laws and regulatory requirements.  He had known that the UW Ph.D.'s were not

17    licensed as medical doctors but had been under the impression that they still had a lawful scope

18    of practice under Washington laws and regulations, which it now became apparent they did not.

19        56.    He had also been under the impression that the UW Ph.D.'s were "board

20    certified" and that such certification provided the necessary authority or permission for UW

21    Ph.D.'s to provide professional oversight.  But Mr. Timm now came to understand that

22    certifications, even if the Ph.D.'s had them – were not a substitute for a state license or defined

23    scope of practice.

24

SECOND AMENDED COMPLAINT - 14

57.    The American Society of Neurophysiological Monitoring ("ASNM") is the largest worldwide organization dedicated to the scientifically-based advancement of IONM.  Its *Guidelines for Supervising Professionals* restates the AMA Policy that that the supervision, interpretation, and intervention in IONM constitutes the practice of medicine, and that supervising professionals must comply with state law concerning scope of practice and licensure.  The Guidelines provide that "board certification" is also necessary, and should be secured within seven years of beginning practice.  Board certification for supervising professionals is provided through the American Board of Neurophysiological Monitoring ("ABNM"), which awards the Diplomate of ABNM (or the "DABNM").

58.    Even if this board certification was a substitute for a proper license and scope of practice, when Mr. Timm attempted to confirm that the U.W. Ph.D. providers had this certification, he discovered that <u>none</u> of them had an active certification.

59.    For Mr. Timm, this glaring lack of qualifications raised an additional concern. Mr. Timm knew the UW Ph.D.'s were providing services at hospitals that did a significant amount of billing to government payors such as Medicare and Medicaid (known as "Apple Health," in the State of Washington).[3]  However, since the UW Ph.D.'s were unlicensed and otherwise lacked a scope of practice, their services were not eligible for reimbursement under the requirements of the Centers for Medicare and Medicaid Services ("CMS").

---

[3] Although SCH treated pediatric patients, it was a "participating" hospital under Medicare since it treated patients qualifying as disabled under the federal healthcare system.  In 2022, it billed more than $35 million to Medicare.  Additionally, it billed more than $1.5 billion to Medicaid.  The other hospitals for which the UW Ph.D.'s provided IONM oversight services, UWMC and Harborview, billed more than $2 billion to Medicare and more than $1.5 billion to Medicaid, collectively.  Both SCH and UW utilized professional billing services through their respective physician groups, Defendant UWP and Defendant CUMG.  Both groups have been the subject of allegations of Medicare fraud in the past.

SECOND AMENDED COMPLAINT - 15

60.     If IONM services are not furnished in accordance with CMS regulations and local

coverage determinations ("LCD's"), then CMS does not consider the service "medically

necessary" and does not reimburse for the service.  *See* 42 C.F.R. § 410.32; *see also* 42 C.F.R. §

482.11(c) (noting that a participating hospital "must assure that personnel are licensed or meet

other applicable standards that are required by State or local laws").

61.     Under relevant LCD's for the State of Washington going back twenty years,

IONM oversight services must be performed by a licensed physician.  *See, e.g.*, LCD L14726

(Sensory Evoked Potentials and Intraop Neurophysiology Monitoring).  Additionally, because

many private payors look to CMS regulations in determining their own reimbursement policies,

it was clear to Mr. Timm that any billing for these services to private payors was likely

unjustified and fraudulent, as well.

62.     In sum, the UW Ph.D.'s lacked necessary licenses and scopes of practice under

state law and regulations; federal law and regulations; and as defined through policies of CMS

and private insurance companies relating to billing practices.[4]

63.     It appeared to Mr. Timm that the UW Ph.D.'s had been internally "qualified" as

though they were attending physicians.  Hospital administrators had indicated to Mr. Timm that

the Ph.D.'s were "credentialed" through the Medical Staff Office (even though Hospital bylaws

state that any member of the Medical Staff must be "legally licensed to practice in the State of

Washington").  They were also often characterized as "physicians."

64.     Within the UW electronic medical records system, for instance, they were

classified as "attending physicians."  On the surgical whiteboard in the operating room, they

---

[4] Additionally, two of the Ph.D.'s in the program, Robert Holdefer and Vicente Martinez, held Ph.D.'s in psychology and biopsychology, respectively, research-oriented degrees far removed from the field of surgical neurophysiology.

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    were listed as "SCM [Spinal Cord Monitoring]-MD." Even when they received their parking

2    passes, the letter stated, "Dear Physician."

3        65.    Over the course of the coming months in 2021, Mr. Timm, on behalf of himself,

4    Mr. Wiman and Periphery, conveyed his concerns regarding the lack of qualifications of the UW

5    Ph.D.'s to SCH surgeons, administrators at the SCH, including the operating room director and

6    clinical strategic sourcing manager, and to the Surgeon-in-Chief (who became the Chief Medical

7    Officer) of the Hospital.

8        66.    Despite Mr. Timm's disclosures, SCH surgeons and physician leadership insisted

9    on continuing to use oversight providers who were not properly authorized under state law to

10   provide the services they were providing.

11       67.    Thus, on February 2, 2021, Mr. Timm sent an email to Joanna Garrison, Manager

12   of Surgery Coordination (copying Ms. Risley), stating that Periphery was willing to cover an

13   upcoming procedure that UW technologists were no longer able to staff, but he wanted to use a

14   licensed oversight provider from Periphery (i.e., a neurologist contracted through RTNA). He

15   sent an email to the surgeon, Dr. Jonathan Perkins, stating the same thing. Knowing the

16   preference of Dr. Perkins for the UW Ph.D.'s, and attempting to accommodate him, Mr. Timm

17   offered to allow the UW Ph.D. on the case (Mr. Kinney) to join the procedure on-site but not

18   have him interpret, oversee, or author the resulting report.[5] Dr. Perkins responded simply by

19   stating that Mr. Kinney was scheduled on the case and asking Mr. Timm to coordinate with Mr.

20   Kinney.

21

22

23        [5] Mr. Timm thought the UW Ph.D.'s could serve in the role of an "advanced"
     technologist, given that they had graduate level coursework in anatomy and physiology, which
24   most technologists did not.

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

68.     On February 4, 2021, Mr. Timm discussed the licensing and qualification issues with Dr. Perkins in person, but Dr. Perkins was adamant that the procedure would not be possible without the UW Ph.D.'s as they offered on-site interpretation.  During the conversation, Dr. Perkins become visibly frustrated and angry with the recent transition of IONM services from the UW providers.

69.     Although Mr. Timm and other Periphery providers, including Mr. Wiman, were concerned with the medicolegal risk of having the Ph.D.'s provide oversight, Periphery tried to be sympathetic to the impact that the abrupt departure of UW's IONM service was having on surgeons accustomed to working with the UW oversight providers, as well as to the difficulty everyone was experiencing transitioning so many cases in such a short period of time.

70.     Mr. Timm and Mr. Wiman did their best to mitigate the issues in the short-term so that they would not impact patient care.  They decided that Mr. Timm, one of Periphery's most experienced technologists, would handle the first procedures involving Ph.D. oversight, in hopes of managing and addressing any barriers to the delivery of service.  Mr. Timm and Mr. Wiman agreed that the best path forward was to continue to educate the leaders at SCH on the issues pertaining to the oversight of the Ph.D.'s, while continuing to deliver excellent IONM services.

71.     To that end, during discussions of the expanded services, Mr. Timm provided Sue Teodecki, SCH's Clinical Strategic Sourcing Manager, a highlighted copy of the ASNM *Guidelines for Supervising Professionals*, which referenced AMA Policy H-410.957 and clearly defined the interpretation and supervision of IONM as being the practice of medicine, and stated that oversight providers should comply with state law regarding scope of practice and licensure.

**Periphery Staff Witnessed and Reported Patient Safety Concerns Relating to Professional Oversight Services Provided By the UW Ph.D.'s.**

SECOND AMENDED COMPLAINT - 18

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

72.    As Periphery began to work with the UW oversight providers, it became clear that the issue of licensing and qualifications was more than an abstract legal or regulatory concern. Periphery staff witnessed multiple incidents in which the conduct or actions of the UW Ph.D.'s threatened the safety of pediatric patients at SCH.[6]

73.    On or about February 2, 2021, Mr. Timm contacted Mr. Kinney to coordinate a care plan for the procedure (referenced above) with Dr. Perkins scheduled for February 4.  In his response, Mr. Kinney confused two (critical) branches of the facial nerve, the temporal and zygomatic branches, believing they were the same thing.

74.    Prior to the procedure, Mr. Timm was able to clarify with Dr. Perkins that the mass was primarily impacting the temporal branch and thus recommended which facial muscles should be mapped for the procedure, thus avoiding any impact to patient care.  The incident with Mr. Kinney, however, troubled Mr. Timm, as did the faith that the Otolaryngology surgeons seemed to have in the UW oversight providers.

75.    On or about March 1, 2021, Mr. Timm reached out to Mr. Kinney regarding a procedure (the resection of a mass) scheduled for March 5 with Dr. Dahl.  The next day, Mr. Kinney provided a care plan that suggested the spinal accessory nerve ("CN XI") was involved, even though the hypoglossal nerve ("CN XII") was actually near the mass.  On the day of the procedure, Mr. Timm discussed the issue with Dr. Dahl, who agreed that the spinal accessory nerve was nowhere near the mass.

---

[6] SCH physicians also complained with some regularity that pediatric patients had been injured during surgeries in which the UW Ph.D.'s role was involved.

SECOND AMENDED COMPLAINT - 19

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

76.     Additionally, on the day of the procedure, Vicente Martinez, the assigned UW oversight provider, did not come into the operating room until 8 a.m., even though the procedure was scheduled to begin at 7:30 a.m.  Once the procedure was underway, Mr. Martinez informed Mr. Timm that he had to go to University of Washington Medical Center for a procedure and abruptly left the room at 8:31 a.m.  When Mr. Timm questioned that decision, which left Mr. Timm without proper oversight, it became clear that Mr. Martinez had no plans to transfer his duties to another oversight provider.  Thus, Mr. Timm was forced to monitor the rest of the procedure alone without oversight.  Fortunately, there was no impact to the patient, and the procedure was completed without complication.  Afterwards, Mr. Kinney attempted to blame this incident on Mr. Timm, asking him to remind Mr. Kinney one day before procedures on which a UW Ph.D. would be providing oversight, ignoring the fact that Mr. Kinney and Mr. Timm had exchanged emails regarding the procedure in the days leading up to it.

77.     On or about March 7, 2021, Mr. Timm emailed his concerns about these incidents to Ms. Risley.  At the outset, he noted: "As we've discussed, the UW oversight team is non-clinical PhD providers without neurophysiology credentials (DABNM, CNIM), so there is considerable risk for SCH to continue utilizing their services without an appropriately licensed provider as the attending."  Mr. Timm noted that in the three procedures where the UW Ph.D.'s had provided oversight to Periphery technologists, two had involved "questionable care plans." He then documented the incidents surrounding the February 4 and March 5, 2021 procedures.

78.     He added, "I know the topic of UW oversight is sensitive for a few of the surgeons at SCH, but I believe this is a good time to evaluate their practices and determine if [the Ph.D.'s] are truly bringing adequate patient care to Seattle Children's Hospital."

SECOND AMENDED COMPLAINT - 20

79.     On or about March 8, 2021, Ms. Risley forwarded Mr. Timm's concerns to Rachel VanDeMark, SCH's Director of Surgical Quality Programs.  (Ms. VanDeMark was in charge of the surgical facility's Quality Improvement ("QI") program.)  Ms. Risley wrote, "Don has great ideas to improve provider awareness of neuromonitoring and improve our situation.  As we stand now, we are primed for serious patient harm."

80.     A few weeks later, Ms. VanDeMark informed Mr. Timm that she had shared his concerns with internal colleagues, and she would follow up with him.  Although she thought a video conference would be scheduled, the conference was never held (or, if it was, Mr. Timm was not invited to participate).  Instead, on or about March 9, 2021, Dr. Ojemann called Mr. Timm to discuss his concerns.

81.     Neither Dr. Ojemann nor anyone at SCH, however, provided Mr. Timm a response to the extensive report he had made regarding the licensing and conduct of the UW Ph.D.'s, and the related patient-care issues.

82.     Despite Mr. Timm's repeated requests to discuss the issues further, SCH would not provide a substantive response to these issues for a period of fifteen months.

83.     As the Hospital delayed in addressing Mr. Timm's concerns, the UW oversight providers continued their practice of leaving the operating room during procedures.  Following a similar incident in which another UW Ph.D., Robert Holdefer, left the operating room during a procedure to do some other work, Mr. Wiman informed him that he needed to remain in the operating room to provide oversight.

84.     On or about April 12, 2021, Mr. Kinney wrote an email to Mr. Timm complaining about the incident.  In the email, he acknowledged that Periphery had "specific standards to maintain" but stated that because of its ongoing contract issues with SCH, his group was not

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    always being paid for its oversight services, and even when it was, his group could not "commit

2    to being on site for the entire case in many instances since we frequently will have other

3    obligations, including cases within our system to attend as well as meetings and teaching, etc."

4    (Mr. Kinney also referred to the fact that Dr. Ojemann wanted the UW Group to provide

5    oversight for all cases at SCH and noted that UW may be billing for these procedures.)

6        85.    Mr. Timm was astounded that the Director of the UW program would take the

7    position that UW Ph.D.'s did not have to be physically present for the duration of the procedures

8    in which they were providing oversight since both the AMA Policy, and CMS and ASNM

9    Guidelines require "direct" and "real time" supervision for the duration of a surgical procedure.

10       86.    Mr. Timm forwarded the email to Ms. Risley and Ms. VanDeMark.  He wrote,

11   "Please include this with my initial concern as it directly relates to the UW PhDs."  He noted, "I

12   cannot have my team exposed without oversight and Greg doesn't appear interested in providing

13   the actual oversight component."  Mr. Timm also stated:

14       At the end of the day, it's the patient who loses when oversight is unwilling to
         cover a procedure based on remuneration/ongoing contract discussions.  I cannot
15       speak to Dr. Ojemann's purported goal of bringing the PhD team back as
         oversight for interpretation of all cases, but given my experience in collaborating
16       with the UW so far it would be unwise.  There has been almost no pre-planning of
         procedures that are being considered complex and what is practiced often has no
17       evidence basis in peer-reviewed literature.

18       87.    He added, "I look forward to addressing this topic in further detail."  But the

19   leadership of SCH offered no response to these concerns.

20       88.    While the hospital refused to act, patient care issues involving the UW Ph.D.'s

21   continued, in some cases resulting in injuries to patients, which were confirmed by SCH

22   physicians.  For example, on or about April 26, 2021, Mr. Timm was present when Dr. Elaine

23   Tsao, a pediatric rehabilitation specialist, visited the operating room and asked Dr. Samuel

24

SECOND AMENDED COMPLAINT - 22

Browd, a neurosurgeon, why patients undergoing a Selective Dorsal Rhizotomy ("SDR"), a procedure that reduces spasticity in the legs of children with cerebral palsy, were experiencing postoperative bladder dysfunction.  Dr. Browd directed the question to Mr. Kinney, who stated there was nothing he could do from the IONM standpoint to reduce the incidence of this problem, an answer that Mr. Timm knew to be wrong.

89.     All peer-reviewed publications on SDR procedures (including publications written by the UW Ph.D.'s) noted that the nerve roots responsible for bowel, bladder, and sexual function should be kept intact whenever they could be identified through electromyography ("EMG") testing, a technique of IONM.  After Mr. Kinney left the operating room, Mr. Timm described this methodology to Dr. Browd.  The following day, Mr. Timm wrote a follow-up email to Dr. Browd, attaching peer-reviewed publications and information on advanced monitoring modalities that confirmed the points he had made.

90.     Despite this state of medical knowledge, on multiple occasions, Periphery technologists witnessed Mr. Kinney make incorrect interpretations of EMG studies that led him to recommend to Dr. Browd that the vital nerve roots be "cut" (i.e., partially sectioned), impairing bladder and other functions.

91.     When Mr. Timm reported this recurring issue to Ms. Risley, she encouraged Mr. Timm to discuss with Dr. Browd regarding the use of licensed professionals for these procedures.  Before approaching Dr. Browd, Mr. Timm spoke with Gene Balzer, the CEO of RTNA (Periphery's primary physician oversight contractor), who offered the possibility of having one of RTNA's neurologists (who lived fifteen minutes away from SCH) provide on-site oversight services for these procedures.  Mr. Balzer also suggested a collaborative multi-center research project to share methodologies and data to improve outcomes.  When Mr. Timm

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

1    approached Dr. Browd with these ideas, he curtly responded, "Not unless Greg Kinney gets hit

2    by a bus."

3        92.    Surgeons in leadership positions at SCH were aware of the post-operative SDR

4    injuries.  On or about June 10, 2021, Dr. Suzanne Yandow, an orthopedic surgeon and the

5    Surgical Director for the Operating Room, wrote in an email, "We are seeing issues with post op

6    bladder dysfunction especially in SDVR [Selective Dorsal Ventral Rhizotomy] patients."  Dr.

7    Ojemann and Surgeon-in-Chief, Andre Dick MD were copied on the email.[7]

8        93.    Months later, in October 2021, during an SDR procedure, Dr. Tsao mentioned

9    that there continued to be multiple incidents of bladder impairment following SDR procedures at

10    SCH.  Other than Dr. Tsao, no one shared these negative outcomes with Periphery.

11        94.    The licensing and quality-of-care issues posed by the UW Ph.D. providers

12    continued and remained unaddressed by SCH, despite Mr. Timm's repeated attempts to address

13    these issues and to bring them to the attention of administrators, physicians, and hospital leaders.

14    Mr. Timm periodically raised these issues during meetings with administrators, but he received

15    no follow up to his reports.

16        95.    Even when Periphery tried to assist the UW Ph.D.'s in coordinating and providing

17    oversight services, the UW Ph.D.'s refused.  After the incident with Mr. Martinez and after Mr.

18    Kinney stated that remote access could mitigate situations where the Ph.D.'s were unable to stay

19    on-site for the duration of a surgical procedure, Periphery provided the Ph.D.'s a secure way to

20    connect remotely to IONM procedures and authorized surgery schedule access in April of 2021.

21        96.    Nonetheless, UW Ph.D.'s rarely took advantage of the technology.  Instead, the

22    Ph.D. providers continued to arrive late and leave before the end of procedures involving IONM

23

24        [7] In April 2021, Dr. Ojemann had become the Interim Chief Medical Officer of SCH.

SECOND AMENDED COMPLAINT - 24

1    services, and often neglected to share a monitoring plan in a timely fashion, leaving technologists

2    scrambling to accommodate the diverse needs of patients.  This resulted in delayed patient care,

3    and at times frustrated the surgeons, who became impatient waiting for the Ph.D.'s to arrive.  On

4    multiple occasions, surgeons asked Periphery staff to proceed without oversight.

5        97.    Throughout the summer of 2021, SCH and UW were negotiating a new

6    agreement with UW for the UW Ph.D.'s to continue to provide oversight services for select

7    procedures.  As part of that process, SCH and UW discussed the qualifications of the UW

8    Ph.D.'s to provide oversight services.  Dr. Esselman communicated to SCH that the Ph.D.'s were

9    authorized to provide oversight services by virtue of the fact that they were supervised by other

10   faculty in the medical school.  This position was unjustified, unlawful, and false.

11       98.    Despite having its own regulatory expertise and being responsible for conducting

12   its own inquiry and verification of the licensure, qualifications, and credentialing of healthcare

13   providers at its own hospital, SCH essentially adopted Dr. Esselman's position as its own.

14       99.    Additionally, around this time, Mr. Kinney approached Mr. Timm and asked to

15   speak with him.  During the conversation, Mr. Kinney stated that he had never obtained any form

16   of certification because his Department Chair (Dr. Esselman) did not require it.  Mr. Kinney

17   mentioned that he had considered obtaining an Audiology degree, which clearly reflected his

18   awareness of his lack of licensing and scope of practice under state law.  However, he had not

19   pursued it because he had children.  Mr. Kinney actually wondered if Periphery was hiring, but

20   Mr. Timm stated clearly, "I'm not going to hire anybody who doesn't have credentials."  Given

21   Mr. Kinney's relative candor on the subject, Mr. Timm continued to expect some sort of

22   resolution from the Hospital on the question of Ph.D. qualifications and/or credentials, but none

23   was forthcoming.

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

100.    Although the licensing and patient-care issues relating to the UW Ph.D.'s were significant, the surgeries involving oversight with the UW Ph.D. team was only a small percentage (approximately 10%) of the procedures on which Periphery provided IONM services. By and large, SCH's surgeons were supportive and complimentary of Periphery's work.

101.    In or about October 2021, Mr. Timm attended a meeting with Ms. Risley and Kayla Reece, another Hospital administrator.  Ms. Risley said that SCH was interested in extending its contract with Periphery for a five-year period.  (The term of the original Agreement, which was twenty-four months, was set to expire on September 15, 2022.)

102.    Mr. Timm was pleased that the Hospital wanted to extend the Agreement. However, he was troubled by the lack of a response from the Hospital regarding the concerns he had expressed about the UW Ph.D.'s.  If anything, the situation with the UW Ph.D.'s seemed to be getting worse.  Mr. Timm said that recently he had noticed an uptick in cases in which the UW Ph.D.'s were scheduled to provide IONM oversight, including in cases outside of their usual otolaryngology (and rhizotomy procedures), which had created conflicts between Periphery and the UW Ph.D.'s.  Ms. Risley and Ms. Reece confirmed that SCH had renewed its contract with UW earlier that fall but assured Mr. Timm that the Hospital was looking into his concerns.

103.    A few weeks after the meeting, on or about November 16, 2021, an otolaryngology scheduler made an "urgent" request for Periphery to provide a technologist for a procedure, although the request was made three days in advance.  When the technologist arrived for the procedure, it became apparent that given the location of the mass involved, the IONM services at issue would be of little value and, as it turned out, the anesthetic being used would render the services useless anyway.  When the anesthesiologist offered to use a different anesthetic, the surgeon (Dr. Dahl) simply canceled the IONM services even though the Periphery

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

1    technologist had already gone through the set-up process and begun monitoring.  Dr. Dahl stated

2    that he had not ordered monitoring in the first place.  The UW Ph.D. oversight provider, who

3    arrived five minutes after the start of the procedure, could have caught any of these issues before

4    the procedure but had failed to do any pre-planning.

5        104.    Pursuant to the Agreement, Periphery was allowed to bill the Hospital for the

6    procedure.  The UW Ph.D. providers would also be able to seek reimbursement for their

7    services.

8        105.    In an email to Ms. Reece and Ms. Risley, dated November 19, 2021, he reported

9    the incident and wrote:

10       It is my impression that we are not being utilized to help the patients, but rather
         [to] support a tangential relationship between the OTO [Otolaryngology] group
11       and UW's neurophysiologists.  If the surgeon did not request neuromonitoring
         with UW for this procedure, it is entirely possible there is a standing order to add
12       them for all procedures falling within a certain category.  From my perspective
         there doesn't appear to be a plan to verify efficacy at the individual patient level,
13       which makes the overall utility of IOM questionable.  If UW had viewed the data
         and made a plan with the surgeon ahead of time, IOM could have been canceled.
14
         As you know, I am deeply invested in this field and seek to educate and empower
15       the surgeons and staff at SCH regarding IOM and its utility, as well as its
         limitations.  I understand that mistakes in scheduling can occur, but this instance
16       had multiple layers of confirmation, including the day of.  I'm putting myself and
         company in a precarious place by bringing these issues to the forefront, but I
17       cannot with good conscience avert my eyes in favor of increased case volumes
         and revenue.
18
19       106.    As he pursued renewing the Agreement with SCH, the incidents involving the

20   UW Ph.D.'s continued to trouble Mr. Timm.  On the basis of SCH's representations that it was

21   continuing to "investigate" the concerns that Mr. Timm had raised, Periphery participated in the

22   renewal negotiation with SCH in good faith and assumed that the Hospital would address Mr.

23   Timm's concerns as part of the contract renewal process.

24       107.    The parties began to exchange drafts for a five-year contract renewal.

SECOND AMENDED COMPLAINT - 27

1

**SCH Withdrew From Contract Renewal Discussions After Periphery Asserted That the Hospital Breached the Agreement By Failing to Provide Qualified Oversight Professionals and to Address the Quality Improvement Issues That Mr. Timm Raised.**

2

3        108.    By late spring 2022, the parties had worked through a number of issues pertaining

4   to the contract renewal.  However, the oversight provided by the UW's Ph.D.'s was becoming

5   increasingly problematic.  With SCH continuing its inaction and silence regarding the concerns

6   that Mr. Timm had raised, patient care continued to suffer.

7        109.    A particularly troubling – and yet not unusual – incident involving the UW

8   Ph.D.'s occurred on or about May 23, 2022.  Mr. Kinney arrived nearly an hour late to a

9   scheduled procedure, missing all pre-procedure discussions between the healthcare providers.

10  During one of the pre-procedure safety checks, Dr. Browd noticed that Mr. Kinney was not

11  present, and a circulating nurse stated that the procedure should not begin until Mr. Kinney

12  arrived.  Despite the fact that Dr. Browd was one of the physicians who preferred to use UW

13  Ph.D.'s for oversight services, he became frustrated.  He claimed that it was Mr. Wiman's

14  responsibility to ensure that Mr. Kinney was present for the procedure and blamed Mr. Wiman

15  for not telling him (Dr. Browd) that Mr. Kinney was not.  Mr. Kinney finally arrived – and then

16  left the room again.

17        110.    Mr. Timm provided a detailed report on the incident a few days later.  Among

18  other things, he referred to billing guidelines for Medicare and Medicaid, noting, "IONM CMS

19  guidelines state . . . that continuous oversight is required once IONM commences.  Greg cannot

20  leave the room once we start monitoring or needs to remotely connect in the event that our data

21  shows nerve root irritation on exposure that we must relay to the surgeon."

22

23

24

SECOND AMENDED COMPLAINT - 28

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1   111. In late May 2022, Mr. Timm requested a meeting with SCH to discuss this

2 incident, and to review the latest proposed draft of the renewal contract between the parties to

3 ensure there were no barriers to finalizing the agreement.

4   112. Before the scheduled meeting, yet another incident occurred.  On or about June 6,

5 2022, Mr. Kinney tried to perform on-site interpretations for two surgeries occurring at the same

6 time!  Even though Mr. Kinney had known of the scheduling conflict weeks in advance, he had

7 failed to arrange for adequate coverage.  During the procedures, he effectively abandoned

8 oversight of one of the procedures for the other.  When the Periphery technologists performing

9 the IONM services in the two procedures (Mr. Wiman and John Scarafiotti) raised concerns with

10 Mr. Kinney, he was dismissive of their concerns and continued to "oversee" both procedures,

11 with the support of the surgeons (Dr. Browd and Dr. Bly).  Mr. Kinney had known these

12 procedures overlapped weeks in advance and failed to ensure adequate patient care and safety by

13 either scheduling another oversight provider or connecting to the procedures remotely.[8]

14   113. During the meeting the next day, on or about June 7, 2022, administrators for

15 SCH confirmed that there were no remaining obstacles to renewing the contract with Periphery.

16 However, in light of the recent incidents, particularly the one involving Mr. Kinney the previous

17 day, Mr. Timm informed the SCH administrators present that SCH was not satisfying the terms

18 of the existing Agreement (by providing qualified oversight providers), and simply had not

19 addressed the quality-of-care concerns submitted to its internal Quality Improvement ("QI")

20 program fifteen months earlier (in or about March of 2021).

21

22    [8] Typically, when done remotely, it is acceptable to oversee up to three procedures

23 involving IONM simultaneously.  But Kinney refused to connect remotely using the access that
Periphery had offered to provide.

24

SECOND AMENDED COMPLAINT - 29

114.    Ms. Risley encouraged Mr. Timm to invoke the contractual breach clause of the Agreement in the stated hope that it would cause SCH executive leadership to (finally) take Periphery's concerns regarding the unlicensed and uncredentialed Ph.D.'s seriously.  (At her request, Mr. Timm also forwarded to Ms. Risley documentation supporting the concerns he had raised.)

115.    Accordingly, on or about June 14, 2022, under Section 6.3 of the Agreement, Periphery served a breach of contract notice to SCH.  (Section 6.3 provides that if a party commits a material breach of the Agreement and fails to correct the breach within ten days of receiving written notice from the non-breaching party, the non-breaching party may terminate the Agreement.)

116.    The breach notice referred to the Agreement, which required SCH to provide an "Interpreting Practitioner" to oversee certain procedures, and stated that the practitioners SCH had provided (i.e., the UW Ph.D. group) did not meet the standards required by the Agreement. The notice also stated that the practitioners failed to provide continuous direct oversight of IONM services, arrived late to scheduled procedures, and/or failed to collaborate with Periphery in the delivery of "safe, timely, and effective patient care."  The notice referred to the June 6, 2022 incident involving Mr. Kinney.  Periphery also attached more than fifty pages of documentation confirming the quality-of-care issues that had arisen, as well as professional guidelines pertaining to the relevant standard of care.

117.    Periphery requested that SCH provide proof of qualifications for each Interpreting Practitioner supplied by the Hospital, as set forth in Section 3(b) of Exhibit A to the Agreement. Periphery stated that it would continue to comply with the terms of the Agreement but requested an immediate remedy of the breaches set forth in the notice, including the provision of "adequate

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    assurance that any Interpreting Practitioners supplied by Children's pursuant to the Agreement

2    meet the qualification and behavioral standards set forth therein."

3        118.    On or about June 22, 2022, SCH's Chief Medical Officer, Dr. Ojemann, called

4    Mr. Timm to discuss the matter.  During the call, Dr. Ojemann stated that going forward only

5    Periphery oversight providers would be utilized for procedures in which Periphery technologists

6    were providing monitoring services.  Dr. Ojemann confirmed this position in a formal letter

7    dated July 1, 2022 (but delivered on or about July 7, 2022).

8        119.    Mr. Timm then received an email from Mr. Kinney, in which he stated, "I just

9    found out about your work at getting us removed from SCH as oversight for the cases we have

10   been participating in.  To put it mildly, I am shocked."  Mr. Kinney then accused Mr. Timm and

11   Periphery of engaging in "a conscious effort . . . to undermine our position at SCH."

12       120.    That Mr. Kinney would be "shocked" to learn that Mr. Timm had reported

13   quality-of-care concerns about the UW Ph.D.'s was itself shocking to Mr. Timm, who had first

14   reported these issues more than a year earlier.  Since Mr. Kinney was the Director of the UW

15   Ph.D. program and himself one of the oversight providers about whom Mr. Timm had expressed

16   concerns, it was apparent that SCH had never investigated Mr. Timm's reports through its QI

17   program.

18       121.    Mr. Kinney's claim that he was unaware that Periphery had patient care issues

19   with him and his Ph.D. team was also disingenuous, given Mr. Kinney's email the previous April

20   2021 regarding the dispute over whether the Ph.D. had to be present for the entire duration of

21   IONM procedures.  Mr. Timm and Mr. Kinney had also exchanged throughout the previous year

22   (2021) relating to the availability (and unavailability) of UW Ph.D.'s for certain procedures.

23

24

SECOND AMENDED COMPLAINT - 31

122.    Moreover, Periphery staff had addressed Mr. Kinney for unacceptable oversight practices only two weeks prior to this email.

123.    Mr. Timm considered Mr. Kinney's email to be a form of harassment for his good-faith reporting of serious compliance and patient care issues by the UW Ph.D.'s. Accordingly, he forwarded the email to Dr. Ojemann and requested that SCH take remedial action against Mr. Kinney in accordance with SCH Bylaws.  No action was ever taken.

124.    SCH's response to the notice of breach, including its "cure" – i.e., that the UW Ph.D. providers would not be providing oversight services in cases that Periphery was supporting – was inadequate.  For one thing, in his response, Dr. Ojemann did not even acknowledge or address Periphery's request for proof of the qualifications of the UW Ph.D.'s.  Moreover, he did not address the troubling behavior of the UW providers, or the legal and regulatory issues posed by their lack of qualifications and credentials.[9]  Indeed, he simply ignored those issues and treated the problems with the UW Group as though they related primarily to "coordination" and "scheduling."  The letter also failed to acknowledge that Periphery's complaints had been submitted to the QI program a year earlier without any follow up, let alone remediation or resolution, from SCH.

125.    During the interim between the exchange of correspondence relating to the breach, Periphery continued to provide IONM services as contractually obligated, and did not

_____

[9] In short order, it would become obvious that Dr. Ojemann was simply going to ignore these larger problems, and any notion that SCH was going to "remove" the UW Ph.D.'s from providing oversight services (as Kinney claimed) was exaggerated.  Within weeks of the breach notice, SCH simply brought in a different contractor to provide technologists to work on cases with the UW Ph.D.'s.  Attesting to the influence of UW leadership in this decision, the contractor was Specialty Care, who provided "overflow" technologist services at University of Washington Medical Center (and related facilities) pursuant to a cumulative 7-year, sole source contract with the University of Washington.

SECOND AMENDED COMPLAINT - 32

interact with the UW Ph.D.'s.  Nonetheless, Periphery technologists encountered hostility and retaliation from SCH surgeons.  Dr. Perkins, for instance, refused to work with Periphery, but he nonetheless visited the operating room during one of the procedures that Dr. Dahl did with Periphery.  Dr. Perkins was visibly angry, crossed his arms, and hovered over Mr. Timm and Mr. Wiman as they attempted to work.

126.    On or about July 25, 2022, Ms. Risley confirmed that SCH's legal team was updating the latest draft of the contract to remove a provision allowing UW's Ph.D.'s to provide oversight services for Periphery's technologists.  Ms. Risley stated that she expected to have something for Mr. Timm within a couple of weeks and noted that SCH's legal team was aware of the contract expiration date of September 15, 2022.

127.    After all of the issues with the UW Ph.D.'s, Mr. Timm was relieved that under the new contract there would be no issues of the UW Ph.D.'s providing oversight services for cases involving Periphery.  But he was still worried that SCH had not responded to any of the other concerns he had raised, and that SCH was still allowing UW Ph.D.'s to provide oversight services despite their lack of proper licensing and qualifications.

128.    On or about July 27, 2022, Periphery provided a formal response to SCH's letter of July 1, 2022.  It reminded SCH that the Agreement required both parties "to comply with applicable federal and state rules, CMS guidelines, professional standards of care, and [SCH] Bylaws," which "includes clearly delineated qualifications for interpreting oversight providers," as set forth in the Agreement.  Periphery cited the American Medical Association's policy stating that interpretation and oversight of IONM constituted the practice of medicine and noted that Washington law and regulations only allowed physicians and Audiologists to perform IONM oversight.  The letter stated, "If Seattle Children's Hospital believes Periphery's understanding is

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

1    incorrect or incomplete, we ask that you educate us."  The letter then detailed the dangerous

2    pattern of conduct on the part of the UW Ph.D.'s, and how it had become normalized over the

3    years at SCH, even though it was grossly inconsistent with relevant standards of care, which the

4    letter also detailed.

5        129.    Periphery's letter stated that the proposed "remedies" set forth in SCH's response

6    to the breach notice "do not yet address the issues listed," as the UW providers had failed to meet

7    the qualifications and standard of care minimums set forth in the Agreement.  Moreover, the

8    letter stated, "using another technical provider [i.e., Specialty Care] to continue with UW

9    oversight does not address the standard of care lapses."  Periphery reminded SCH that it was

10   "professionally and ethically bound" to see these concerns were "taken seriously and dealt with

11   constructively."

12       130.    In closing, Periphery's letter stated, "It is our desire to continue supporting Seattle

13   Children's Hospital."  Consistent with that goal, Periphery requested that SCH provide a cure to

14   the breach "that addresses and ensures all UW providers will obtain DABNM certification in

15   accordance with the current national guidelines" and "that addresses and ensures all UW

16   providers will adhere to all ASNM guidelines pertaining to oversight to ensure patient safety and

17   the standard of care is met or exceed[ed] as in accordance with Facility Bylaws."

18       131.    After the July 27, 2022 correspondence, Mr. Timm heard nothing about the new

19   contract for weeks.  On August 24, 2022, he reached out to Ms. Risley to check on the status of

20   the renewal.  Two days later, Ms. Risley replied, claiming that SCH's legal team was continuing

21   to work on the contract.  Ms. Risley also stated that she had asked Casey McFarland, the new

22   Business Director for Perioperative and Surgical Services, to work with Whitney Murphy, Vice

23   President of Surgical Services, to determine issues related to the contract.

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

132.    Ms. Risley's statement was odd since both Ms. McFarland and Ms. Murphy were out on leave (and, in fact, did not contact Mr. Timm even though Ms. Risley had requested that they do so).  Additionally, the "issues" that Ms. Risley mentioned, including "coverage needs" and "length of [the] contract," had been discussed and agreed to by the parties (including SCH's physician leadership) in early 2022 and long since been incorporated into earlier versions of the agreement.

133.    Worried that SCH was revisiting contract issues and potentially backing out of the renewal contract, Mr. Timm sent Ms. Risley an email the same day, expressing his frustration with how SCH was drawing out the contract renewal and failing to address the issues at the heart of the breach notice.  He noted, "[I] see SCH is willing to gamble by bringing in a second vendor and continuing to utilize the unlicensed / non-credentialed PHD oversight."  Mr. Timm summarized what Periphery had endured to date, including being "forced to utilize unqualified oversight providers" who were unwilling to meet minimum standards of care, and hoped "that someone [at SCH] engages at a meaningful level soon."

134.    On or about August 31, 2022, Periphery received a letter (dated August 30, 2022) from SCH, in which the Hospital responded to the July 27, 2022 letter and August 26, 2022 email Mr. Timm sent to Ms. Risley.  In the Hospital's first-ever substantive response to the concerns Mr. Timm had expressed seventeen months earlier, Dr. Ojemann made a number of false and/or unjustified claims.

135.    First, Dr. Ojemann claimed that the Hospital had "thoroughly" reviewed the cases that Mr. Timm identified in March 2021 "as part of [its] quality improvement program" and that the neuromonitoring services were provided "competently and safely," even though (1) there was no evidence that such a review had ever occurred; (2) the Hospital had never asked Mr. Timm to

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    provide information regarding such a review, and (3) the Hospital had never provided the

2    findings of such a review.  Nor had anyone at SCH mentioned that such a review had taken place

3    in the seventeen months that the matter had been pending.

4        136.    Dr. Ojemann made the baldly false claim that these findings of the review had

5    been "previously relayed" to Periphery, which they had not been.  Mischaracterizing Periphery's

6    position, Dr. Ojemann also wrote: "However, we agree that going forward the oversight provider

7    must be 'continuously available' to perform interoperative responsibilities during an active

8    procedure."  This standard of care – i.e., that the UW providers be "continuously available" –

9    was at odds with every applicable standard of care, which requires "real time interpretation" of

10   IONM data for the duration of a medical procedure.  It was also at odds with Section 3(a) of the

11   Agreement, which requires every surgical neurophysiologist from Periphery to work "at all

12   times" under the direction and supervision of an Interpreting Practitioner.

13       137.    Second, with regard to the Ph.D.'s qualifications, the Hospital took the position

14   that the Ph.D.'s did not need credentials, as the providers were "sufficiently qualified given their

15   academic setting and participation in industry education, teaching, and research."  Thus, Dr.

16   Ojemann essentially parroted, without any support, the position that UW (through Dr. Esselman)

17   had taken with regard to its Ph.D.'s the previous summer.  This position was not only unjustified,

18   unlawful, and false, but also illogical, in that it would allow any Ph.D.-level faculty member at

19   UW to practice medicine, which was wildly inconsistent with State and federal laws pertaining

20   to the practice of medicine and licensed medical professions.  (A Ph.D. in chemistry could

21   practice anesthesia or a Ph.D. anatomist could operate in surgical procedures, for instance, since

22   these doctorates teach and perform research in these related fields.)

23

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1    138.    Although Dr. Ojemann noted that "peer organizations" did not require such

2    credentials, he provided no such examples.  Dr. Ojemann's further claim that SCH respects the

3    "independent professional judgment of surgeons who prefer to work with" the UW providers

4    was simply non-responsive as to the issue of the qualifications of those providers, and ignored

5    the possibility that the surgeons were aiding and abetting the unlicensed practice of medicine by

6    those providers.  Rev. Code Wash. § 18.130.180(10).

7    139.    Dr. Ojemann provided no explanation as to how the UW Ph.D. providers were

8    licensed under state law, as required by Section 2.1 of the Agreement and Paragraph 3 of Exhibit

9    A to the Agreement.  The letter also stated that the current Agreement does not require the

10    Ph.D.'s to hold certification through DABNM because the process for obtaining credentials at

11    the Hospital "may" include such certification, which was a misreading of the Agreement.  SCH

12    provided no evidence or laws or regulations to support the factual or legal positions it took in the

13    letter.

14    140.    Although Dr. Ojemann closed the letter by saying that SCH "continues to want to

15    renew the Agreement with Periphery," it "consider[s] the outstanding issues resolved in the

16    current state."  In short, in order for the parties to move forward on the new contract, Periphery

17    needed to accept the Hospital's positions on these issues.  Put a different way, SCH was

18    conditioning the renewal on Periphery's acceptance of the Hospital's unlawful use of the

19    unlicensed Ph.D.s.  (Despite the representations of Dr. Ojemann in July 2022, the Hospital never

20    provided Periphery with a draft of the renewal contract making clear that Periphery would not be

21    required to provide technologist services in cases in which the unlicensed U.W. Ph.D.'s would

22    provide oversight and supervision of IONM.)

23

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

141.    The Hospital's factual and legal positions were unjustified and unlawful and would have required Periphery to ratify conduct that constituted the unlicensed practice of medicine, substandard and unsafe patient care, and violations of federal regulations pertaining to Medicare and Medicaid.

142.    Periphery could not lawfully accept these terms.

143.    On September 9, 2022, Periphery provided a detailed rebuttal of the points made by Dr. Ojemann on behalf of the Hospital, citing to relevant laws, regulations, and professional guidelines.  Periphery informed SCH that in light of the unjustified and unlawful positions it was asserting and requiring Periphery to accept as a condition of renewing the contract, it was left with no choice but to not move forward with the renewal.

144.    On September 16, 2022, the term of the Agreement expired, and Periphery stopped providing neuromonitoring services at SCH.  (In fact, on or around September 14 or 15, 2022, SCH removed Periphery from a scheduled procedure, replacing it with Specialty Care, on the ground that the Agreement had already expired.)

145.    As a result of its reports regarding the lack of qualifications of the UW Ph.D. providers, their failure to meet minimum standards of care, as well as its refusal to accept SCH's unlawful positions on these matters, Periphery sustained damages that included the loss of procedures to competitor Specialty Care until the end of the initial term of the Agreement; and the loss of the contract renewal and future at SCH, which was devastating to a new healthcare business trying to survive during COVID-19.  Periphery also suffered significant financial losses and asset depreciation on equipment and supplies it had purchased for use at SCH.

SECOND AMENDED COMPLAINT - 38

146.    In total, Periphery provided coverage for 640 surgeries during the two-year term of the "overflow" agreement.  The revenue it earned for providing those services was in excess of $1,475,000.00.

147.    Based on the last draft of the renewal contract, Periphery was projected to cover more surgeries per year at a higher rate per surgery over the succeeding five years of the renewal contract.  Since the fee for those services would increase, Periphery's revenue for providing these services was projected to be in excess of $6,000,000.

148.    IONM is a niche healthcare service, in which contract decisions are often based on the recommendation of surgeons, who connect administrators with competent IONM providers that they have previously worked with.  Following the Hospital's denial of a renewal contract to Periphery, Mr. Timm and Mr. Wiman learned that people connected with the Hospital, including the UW Ph.D.'s, were stating that Periphery had abandoned SCH and lacked integrity.  These damaging statements made it all but impossible for Periphery to secure subsequent contracts.

149.    Due to a lack of business, Periphery was forced to let go employees and contractors, and the company eventually seized being able to provide IONM services.

### COUNT I – BREACH OF CONTRACT
### (Against Defendant SCH)

150.    Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth herein.

151.    On or about September 15, 2020, Periphery and Defendants entered into a "Clinical Services Agreement for Surgical Neuromonitoring Services" ("the Agreement").

152.    The Agreement was a valid, legally enforceable contract.

SECOND AMENDED COMPLAINT - 39

153.    Among other obligations, in cases in which Defendant SCH provided an "Interpreting Practitioner" for procedures in which Periphery was providing the technologist, Defendant agreed to provide Interpreting Practitioners who met the licensing and qualification requirements of Section 2.1 of the Agreement and Exhibit A to the Agreement.

154.    Those requirements included:

(i) valid and unrestricted licensure, accreditations, certifications, and clinical privileges necessary to furnish the Services at Facilities; (ii) active enrollment and eligibility with respect to all state and federal health care programs; and (iii) demonstrated competency to provide the Services in a timely, safe, and effective manner in accordance with applicable ethical and professional standards.

155.    Additionally, Section 8.3 of the Agreement stated: "The parties intend this Agreement to comply with all laws, regulations and requirements applicable to physicians, hospitals, Medicare and Medicaid participants, and healthcare professionals in general."

156.    Defendant SCH failed to perform its obligations under the Agreement, including by providing Interpreting Practitioners who were not licensed to provide such services under state law; did not meet the eligibility requirements of all state and federal health care programs; and did not have demonstrated competency to provide the services in a timely, safe, and effective manner in accordance with applicable ethical and professional standards.

157.    Periphery brought these failures to the attention of Defendant, but SCH did not remediate or cure these issues.

158.    As a result of Defendant's failure to perform its obligations under the Agreement, it materially breached the Agreement.

159.    As a result of Defendant's material breaches of the Agreement, Periphery lost the opportunity to provide technologist services in certain cases until the end of the initial term of the

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

1    Agreement; was unable to use equipment and supplies it had purchased to provide those services;

2    and was denied the opportunity to renew the Agreement with SCH.

3        160.    Defendant's breaches proximately caused Periphery to suffer economic and

4    consequential losses, justifying an award of monetary damages in an amount to be proven at trial

5    and other just relief, but no less than $6 million.

6        161.    Periphery seeks all relief that the court deems appropriate, including declaratory

7    relief, injunctive relief, and an award of damages against Defendant.

8    **COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
     **<u>(Against Defendant SCH)</u>**

9
10       162.    Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth

     herein.

11
12       163.    Under Washington law, there is in every contract an implied duty of good faith

     and fair dealing that requires the parties to cooperate with each other so that each may obtain the

13
     full benefit of performance.  The implied duty of good faith and fair dealing presumes honesty

14
     and lawfulness of purpose.

15
16       164.    A violation of a statutory duty related to a contract term constitutes a breach of

     the implied duty of good faith and fair dealing.

17
18       165.    Moreover, actions taken by one party that interfere with the other party's ability to

     perform the contract breach the implied duty of good faith and fair dealing.

19
20       166.    When a party has discretion over a future contract term, it has an implied duty of

     good faith and fair dealing in setting and performing that contract term.

21
22       167.    On September 15, 2020, Periphery and Defendant SCH entered into a "Clinical

     Services Agreement for Surgical Neuromonitoring Services" ("the Agreement")

23
24

SECOND AMENDED COMPLAINT - 41

168.    The Agreement was a valid, legally enforceable contract, and thus contained an implied duty of good faith and fair dealing that required the parties to cooperate with each other so that each could obtain the full benefit of performance.

169.    Defendant breached the implied duty of good faith and fair dealing by, among other ways, forcing Periphery to work with unlicensed oversight providers; assigning technologist work that had formerly been performed by Periphery to another vendor who was willing to work with unlicensed oversight providers; and conditioning a renewal of Periphery's Agreement on its willingness to work with oversight providers who were unlicensed and lacked a scope of practice under state law.

170.    Additionally, although the Agreement provided Defendant with discretion as to whether to renew the Agreement beyond its initial term, Defendant denied renewal on the basis that Periphery would not agree to be subject to oversight by providers who were unlicensed, lacked a scope of practice under state law, and/or were providing oversight services in violation of state law.  This also constitutes a breach of the implied duty of good faith and fair dealing.

171.    Defendant's breaches of the implied duty of good faith and fair dealing proximately caused Periphery to suffer economic and consequential losses, justifying an award of monetary damages in an amount to be proven at trial and other just relief, but no less than $6 million.

172.    Periphery seeks all relief that the court deems appropriate, including declaratory relief, injunctive relief, and an award of damages against Defendant.

**COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Defendants State, UWP, Esselman, and Kinney)**

173.    Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth herein.

SECOND AMENDED COMPLAINT - 42

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

174.    On September 15, 2020, Periphery and Defendant SCH entered into a "Clinical Services Agreement for Surgical Neuromonitoring Services" ("the Agreement")

175.    The Agreement was a valid, legally enforceable contract.

176.    Defendants State, UWP, Esselman and Kinney had knowledge of the Agreement.

177.    Defendants State, UWP, Esselman and Kinney took actions to interfere with the Agreement, including by failing to show up on time for scheduled procedures; failing to continuously and directly supervise Periphery technologists, thus obstructing and imperiling Periphery's own performance under the Agreement; misrepresenting and lying about the qualifications of the UW Ph.D. oversight providers as a way of undermining Periphery's existing position and relationship with the Hospital; and exerting their influence as affiliates of SCH to undermine Periphery's existing position and relationship with the Hospital.

178.    These actions were taken with the intent to cause SCH to breach and/or not to renew the Agreement with Periphery, and with knowledge that interference with the Agreement was substantially certain to result from these actions.

179.    These actions involved conduct that was false and otherwise improper.

180.    The Defendants took these actions in bad faith for an improper purpose, using improper means.  Among other acts, Defendants' actions violated relevant state laws governing the practice of medicine and professional standards of patient care.  Defendants also asserted that they had a lawful right to provide oversight services using unlicensed Ph.D.s, which was an unlawful position that they knew was unlawful.

181.    The Defendants' acts of interference with the Agreement were the proximate cause of frustration and aggravation in Periphery's performance of the Agreement; harassment and hostility suffered by Mr. Wiman and Mr. Timm; and SCH's decision to breach the

SECOND AMENDED COMPLAINT - 43

1  Agreement by assigning technologist work that had formerly been performed by Periphery to

2  another vendor who was willing to work with unlicensed oversight providers (who itself was

3  already a contractor of Defendants).

4      182.    Periphery has suffered economic and consequential losses because of Defendants'

5  interference with the Agreement, justifying an award of monetary damages in an amount to be

6  proven at trial and other just relief in excess of $6 million.

7      183.    Additionally, as a result of Defendants' actions, Mr. Timm and Mr. Wiman

8  suffered mental distress, discomfort, inconvenience, injury to reputation, and humiliation,

9  justifying an award of monetary damages in an amount to be proven at trial.

10      184.    Plaintiffs seek all relief that the court deems appropriate, including declaratory

11  relief, injunctive relief, and an award of actual damages against Defendants.

12  **COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP OR
    EXPECTANCY**
13  **(Against Defendants State, UWP, Esselman, and Kinney)**

14      185.    Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth

15  herein.

16      186.    Based on their negotiation and execution of an agreement for Periphery to provide

17  IONM services, Periphery and SCH had a valid business relationship.

18      187.    Based on the negotiation and advanced drafts they had exchanged regarding an

19  upcoming five-year renewal of the agreement for Periphery to provide IONM services, Periphery

20  had a valid business expectancy in the renewal.

21      188.    Defendants State, UWP, Esselman and Kinney had knowledge of this business

22  relationship and this business expectancy.

23

24

SECOND AMENDED COMPLAINT - 44

189.    Defendants State, UWP, Esselman and Kinney took actions to interfere with this business relationship and business expectancy, including by, among other ways, exerting their influence as affiliates of SCH to undermine Periphery's existing position and relationship with the Hospital; and misrepresenting and lying about the qualifications of the UW Ph.D. oversight providers as a way of causing SCH to deny the renewal to Periphery.

190.    These actions were taken with the intent to cause SCH to end the business relationship and the business expectancy by not renewing the Agreement with Periphery, and with knowledge that interference with the relationship and expectancy was substantially certain to result from these actions.

191.    These actions involved conduct that was false and otherwise improper.

192.    The Defendants took these actions in bad faith for an improper purpose, using improper means. Among other acts, Defendants asserted that they had a lawful right to provide oversight services using unlicensed Ph.D.'s, which was an unlawful position that they knew was unlawful, and which they intended for SCH to adopt as its own position.

193.    The Defendants' acts of interference with the Agreement were the proximate cause of SCH's decision to deny Periphery the five-year renewal contract.

194.    Periphery has suffered economic and consequential losses because of Defendants' interference with the Agreement, justifying an award of monetary damages in an amount to be proven at trial and other just relief, but not less than $6 million.

195.    Additionally, as a result of Defendants' actions, Mr. Timm and Mr. Wiman suffered mental distress, discomfort, inconvenience, injury to reputation, and humiliation, justifying an award of monetary damages in an amount to be proven at trial.

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

196.    Plaintiffs seek all relief that the court deems appropriate, including declaratory relief, injunctive relief, and an award of actual damages against Defendants.

**COUNT V – RETALIATION IN VIOLATION OF THE WASHINGTON HEALTHCARE WHISTLEBLOWER STATUTE (REV. CODE WASH. § 43.70.075)**
**(Against All Defendants)**

197.    Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth herein.

198.    Section 43.70.075(1)(d) of the Revised Code of Washington provides:

A whistleblower who is not an employee and who as a result of being a whistleblower has been subjected to reprisal or retaliatory action may initiate a civil action in a court of competent jurisdiction to either enjoin further violations, recover actual damages sustained by the whistleblower, or both, and recover the cost of the suit including reasonable attorneys' fees.

Rev. Code Wash. § 43.70.075(1)(d).

199.    The Statute defines "whistleblower" to mean "a consumer, employee, or health care professional . . . who in good faith reports alleged quality of care concerns to the department of health or initiates, participates, or cooperates in any investigation or administrative proceeding under this section.  Rev. Code Wash. § 43.70.075(3)(d).

200.    Mr. Timm and Mr. Wiman are "health care professionals" under Section 43.70.075(3)(d).

201.    Mr. Timm and Mr. Wiman are whistleblowers under Section 43.70.075(1)(d) because they made good faith reports of alleged quality of care concerns.

202.    Under Rev. Code Wash. § 70.56.020(2), when a medical facility confirms that an adverse event has occurred, it shall notify the Department of Health of the event within forty-eight hours and shall submit a report of the event within forty-five days.  The report must include

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

a "root cause analysis" of the event and describe any corrective action that will be implemented or provide reasons why corrective action was not taken.  Rev. Code Wash. § 70.56.020(4).

203.    An adverse event includes "[a]ny instance of care ordered by or provided by someone impersonating a physician, nurse, pharmacist, or other licensed health care provider." Wash. Admin Code § 246-302-030(7)(a).

204.    Mr. Timm and Mr. Wiman repeatedly made reports to SCH regarding the Hospital's use of UW Ph.D. providers who were engaged in the practice of medicine but were unlicensed and lacked a scope of practice under state law, and thus were "impersonating" a physician or other licensed health care provider.

205.    Thus, for purposes of the statute, Mr. Timm and Mr. Wiman were reporting "adverse events" to the Hospital, which had a mandatory duty to report such events to the Department of Health.  As such, Mr. Timm and Mr. Wiman's reports were reports made to the "Department of Health" for purposes of Section 43.70.075(3)(d).

206.    A hospital also has a duty to report to the Department of Health if a licensed practitioner has committed unprofessional conduct as defined in Section 18.130.180.  Rev. Code Wash. § 18.130.080(1)(b)(i); Rev. Code Wash. § 70.41.210.  Under Rev. Code Wash. § 18.130.180(10), unprofessional conduct includes "[a]iding or abetting an unlicensed person to practice when a license is required."

207.    Mr. Timm and Mr. Wiman repeatedly made reports to SCH regarding the aiding and abetting, and support of licensed persons (including Drs. Randall Bly, John Dahl, Jonathan Perkins, Samuel Browd, and Jeffrey Ojemann) in using UW Ph.D. providers who were engaged in the practice of medicine but were unlicensed and lacked a scope of practice under state law.

SECOND AMENDED COMPLAINT - 47

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

208.     Thus, for purposes of the statute, Mr. Timm and Mr. Wiman were reporting

unprofessional conduct of licensed persons to the Hospital, which had a mandatory duty to report

such conduct to the Department of Health.  As such, Mr. Timm and Mr. Wiman's reports were

reports made to the "Department of Health" for purposes of Section 43.70.075(3)(d).

209.     Additionally, a hospital is required to establish a quality improvement program

under state law.  Rev. Code Wash. § 70.41.200(1).  A quality improvement program must have

"[p]olicies to ensure compliance with the reporting requirements of this section," including

Section 70.41.210 regarding the reporting of unprofessional conduct to the Department of

Health.  Rev. Code Wash. § 70.41.200.

210.     Mr. Timm and Mr. Wiman made a number of their reports through the Hospital's

quality improvement program, and as such, their reports were made to the "Department of

Health" for purposes of Section 43.70.075(3)(d).

211.     Mr. Timm and Mr. Wiman made their reports of quality-of-care issues in good

faith.

212.     Defendants had knowledge and were aware that Mr. Timm and Mr. Wiman had

made these reports.

213.     Defendants SCH, CUMG, Ojemann, Browd, and Perkins took reprisals and

retaliatory actions against Mr. Timm and Mr. Wiman, including, among other ways, by harassing

Mr. Timm and Mr. Wiman; replacing them as providers of IONM services in cases involving the

UW Ph.D.s; making the renewal of their company's contract contingent on accepting the

unlicensed practice of medicine, as well as dangerous behaviors and misconduct by the UW

Ph.D.s; and denying them a renewal contract to provide IONM services at the Hospital.

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

214.    Defendants State, UWP, Esselman, and Kinney took reprisals and retaliatory actions against Mr. Timm and Mr. Wiman, including by failing to show up on time for scheduled procedures; failing to continuously and directly supervise Periphery technologists, thus obstructing and imperiling Periphery's own performance under the Agreement; harassing them; misrepresenting and lying about qualifications of the UW Ph.D. oversight providers as a way of undermining Periphery's existing contract and relationship with the Hospital; and exerting their influence as affiliates of SCH to undermine Periphery's existing position and to induce SCH to deny a contract renewal to Periphery.

215.    Defendants took these reprisals and retaliatory actions because Mr. Timm and Mr. Wiman were whistleblowers and engaged in actions that made them whistleblowers.

216.    By these actions, Defendants violated Rev. Code Wash. § 43.70.075(1)(d).

217.    As a result of Defendants' unlawful actions against Mr. Timm and Mr. Wiman, Plaintiffs (including Periphery) have suffered economic and consequential losses, justifying an award of monetary damages in an amount to be proven at trial and other just relief, but no less than $6 million.

218.    Additionally, as a result of Defendants' unlawful actions against Mr. Timm and Mr. Wiman, they have suffered emotional anguish and distress, as well as damage to their reputations, justifying an award of monetary damages to be proven at trial.

219.    As authorized by Rev. Code. Wash. § 43.70.075(1)(d), Plaintiffs seek all such relief as the court deems appropriate, including injunctive relief, an award of actual damages against Defendants, and recovery of their attorneys' fees and litigation costs in this matter.

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C.
20006
Tel: 771-220-6116

1

2

**COUNT VI – RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3730(h))**
**(Against Defendants SCH and CUMG)**

3

4

220.    Plaintiffs restate and re-allege the foregoing paragraphs as though fully set forth herein.

5

6

7

8

221.    The federal False Claims Act ("FCA") provides that a contractor "shall be entitled to all relief necessary to make" the contractor whole if the contractor is discriminated against because of lawful acts done by the contractor "in furtherance of an action" under the FCA or "other efforts to stop 1 or more violations" of the FCA.  *See* 31 U.S.C. § 3730(h)(1).

9

10

11

222.    A plaintiff engages in "protected activity" under the FCA by taking lawful actions "in furtherance of" a qui tam under the False Claims Act or by making "other efforts to stop 1 or more violations of this subchapter."

12

13

14

15

16

223.    SCH is a "participating" hospital under Medicare since it treated patients qualifying as disabled under the federal healthcare system.  The UW Ph.D.s were providing services at other participating hospitals, including the University of Washington Medical Center and Harborview.  SCH, as well as the University of Washington Medical Center and Harborview, did a significant amount of billing to Medicare.

17

18

19

20

21

224.    Because the UW Ph.D.'s were unlicensed and otherwise lacked a scope of practice under state law, their services were not eligible for reimbursement under the requirements of the Centers for Medicare and Medicaid Services ("CMS").  *See* 42 C.F.R. § 410.32; *see also* 42 C.F.R. § 482.11(c); LCD L14726 (Sensory Evoked Potentials and Intraop Neurophysiology Monitoring).

22

23

225.    Mr. Timm and Mr. Wiman attempted to stop these violations of the FCA by reporting their concerns that the oversight services the UW Ph.D.'s were providing were not

24

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

eligible for reimbursement under Medicare because the UW Ph.D.'s were not licensed under

state law and lacked a scope of practice, and because the UW Ph.D.'s were not meeting CMS

guidelines for billing, including because they were failing to provide "continuous oversight"

during procedures.

226.    Given their years of experience performing IONM technologist services and their

familiarity with Medicare laws, regulations, and guidelines, Mr. Timm and Mr. Wiman believed

that Defendants were violating the FCA by attempting to obtain reimbursement for IONM

supervision and interpretation services performed by providers who were not licensed to provide

those services, which (as a result) were not eligible for reimbursement.

227.    Mr. Timm and Mr. Wiman's beliefs that Defendants were violating the FCA were

objectively reasonable.

228.    These actions by Mr. Timm and Mr. Wiman constituted protected activity under

the FCA.

229.    Defendants had knowledge and were aware that Mr. Timm and Mr. Wiman

engaged in protected activity under the FCA.

230.    Defendants SCH and CUMG retaliated and discriminated against Mr. Timm, Mr.

Wiman, and Periphery (their company) by, among other ways, harassing them; replacing them as

a provider of IONM services in cases involving the UW Ph.D.s; and refusing to renew the

contract with Periphery to provide IONM technologist services.

231.    Defendant UWP retaliated and discriminated against Mr. Timm, Mr. Wiman, and

Periphery (their company) by, among other ways, misrepresenting and lying about qualifications

of the UW Ph.D. oversight providers as a way of undermining Periphery's existing contract and

SECOND AMENDED COMPLAINT - 51

relationship with the Hospital; and exerting its influence as an affiliate of SCH to undermine Periphery's existing position and to induce SCH to deny a contract renewal to Periphery.

232. Defendants SCH and/or CUMG took these actions of retaliation and discrimination because Mr. Timm and Mr. Wiman engaged in protected activity.

233. As a result of Defendants' unlawful actions against Mr. Timm and Mr. Wiman, Plaintiffs (including Periphery) have suffered economic and consequential losses, justifying an award of monetary damages in an amount to be proven at trial and other just relief, but no less than $6 million.

234. Additionally, as a result of Defendant's unlawful actions against Mr. Timm and Mr. Wiman, have suffered emotional anguish and distress, as well as damage to their reputations, justifying an award of monetary damages to be proven at trial.

235. As authorized by 31 U.S.C. § 3730(h), Plaintiffs seek all relief necessary to make them whole, including reinstatement; damages as set forth in the statute; two times the amount of economic damages (backpay) awarded under the statute; interest; compensation for special damages; reimbursement of attorneys' fees, and costs associated with pursuing this matter; and all other relief that the court deems appropriate.

**COUNT VII – RETALIATION IN VIOLATION OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT (REV. CODE. WASH. § 74.66.090(1))**
**(Against Defendants SCH and CUMG)**

236. Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth herein.

237. The Washington Medicaid Fraud False Claims Act ("WA FCA") provides that a contractor "is entitled to all relief necessary to make" the contractor whole if the contractor is discriminated against because of lawful acts done by the contractor "in furtherance of an action"

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

1   under the WA FCA or "other efforts to stop one or more violations" of the WA FCA.  *See* Rev.

2   Code Wash. § 74.66.090(1).

3          238.    A plaintiff engages in "protected activity" under the WA FCA by taking lawful

4   actions "in furtherance of" an action under the WA FCA or by making "other efforts to stop one

5   or more violations" of the WA FCA.

6          239.    SCH is a "participating" hospital under Medicaid (known as "Apple Health," in

7   the State of Washington).  The UW Ph.D.'s were providing services at other participating

8   hospitals, including the University of Washington Medical Center and Harborview.  SCH, as

9   well as the University of Washington Medical Center and Harborview, did a significant amount

10  of billing to Medicaid.

11         240.    Because the UW Ph.D.'s were unlicensed and otherwise lacked a scope of

12  practice under state law, their services were not eligible for reimbursement under the

13  requirements of the Centers for Medicare and Medicaid Services ("CMS").  *See* 42 C.F.R. §

14  410.32; *see also* 42 C.F.R. § 482.11(c); LCD L14726 (Sensory Evoked Potentials and Intraop

15  Neurophysiology Monitoring).

16         241.    Mr. Timm and Mr. Wiman attempted to stop these violations of the WA FCA by

17  reporting their concerns that the oversight services the UW Ph.D.'s were providing were not

18  eligible for reimbursement under Medicaid because the UW Ph.D.'s were not licensed under

19  state law and lacked a scope of practice, and because the UW Ph.D.'s were not meeting CMS

20  guidelines for billing, including because they were failing to provide "continuous oversight"

21  during procedures.

22         242.    Given their years of experience performing IONM technologist services and their

23  familiarity with Medicaid laws, regulations, and guidelines, Mr. Timm and Mr. Wiman believed

24

SECOND AMENDED COMPLAINT - 53

that Defendants were violating the WA FCA by attempting to obtain reimbursement for IONM supervision and interpretation services performed by providers who were not licensed to provide those services, which (as a result) were not eligible for reimbursement.

243.    Mr. Timm and Mr. Wiman's beliefs that Defendants were violating the WA FCA were objectively reasonable.

244.    These actions by Mr. Timm and Mr. Wiman constituted protected activity under the WA FCA.

245.    Defendants had knowledge and were aware that Mr. Timm and Mr. Wiman engaged in protected activity under the WA FCA.

246.    Defendants SCH and CUMG retaliated and discriminated against Mr. Timm, Mr. Wiman, and Periphery (their company) by, among other ways, harassing them; replacing them as a provider of IONM services in cases involving the UW Ph.D.'s; and refusing to renew the contract with Periphery to provide IONM technologist services.

247.    Defendant UWP retaliated and discriminated against Mr. Timm, Mr. Wiman, and Periphery (their company) by, among other ways, misrepresenting and lying about qualifications of the UW Ph.D. oversight providers as a way of undermining Periphery's existing contract and relationship with the Hospital; and exerting its influence as an affiliate of SCH to undermine Periphery's existing position and to induce SCH to deny a contract renewal to Periphery.

248.    Defendants SCH and/or CUMG took these actions of retaliation and discrimination because Mr. Timm and Mr. Wiman engaged in protected activity.

249.    Defendants' actions were taken with evil motive, actual malice, intent to injure, deliberate indifference and/or willful disregard for the rights of Plaintiffs, and/or with reckless indifference to those rights.

SECOND AMENDED COMPLAINT - 54

250.    As a result of Defendants' unlawful actions against Mr. Timm and Mr. Wiman, Plaintiffs (including Periphery) have suffered economic and consequential losses, justifying an award of monetary damages in an amount to be proven at trial and other just relief, but no less than $6 million.

251.    Additionally, as a result of Defendants' unlawful actions against Mr. Timm and Mr. Wiman, they have suffered emotional anguish and distress, as well as damage to their reputations, justifying an award of monetary damages to be proven at trial.

252.    As authorized by Rev. Code Wash. § 74.66.090(1), Plaintiffs seek all relief necessary to make them whole, including reinstatement; damages as set forth in the statute; two times the amount of economic damages (backpay) awarded under the statute; interest; compensation for special damages; reimbursement of attorneys' fees, and costs associated with pursuing this matter; and all other relief that the court deems appropriate.

253.    Additionally, pursuant to Section 74.66.090(3), Plaintiff seeks all relief "available under [Rev. Code Wash.] 49.60.030(2)," including but not limited to economic damages, compensatory damages, and punitive damages authorized directly or by reference in that provision.

## **PRAYER FOR RELIEF**

**WHEREFORE**, in consideration of the foregoing, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

a)    Declare that Defendant SCH breached the Agreement with Periphery by using UW Ph.D. providers who lacked licenses and a scope of practice under state law to oversee IONM services;

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

b)  Declare that Defendant SCH breached the implied covenant of good faith and fair dealing with Periphery;

c)  Declare that Defendants State, UWP, Esselman, and Kinney tortiously interfered with the Agreement between SCH and Periphery;

d)  Declare that Defendants State, UWP, Esselman, and Kinney tortiously interfered with the business relationship between SCH and Periphery, as well as the business expectancy that Periphery had in a renewal of its contract with SCH;

e)  Declare that all Defendants retaliated against Plaintiffs in violation of the Washington Healthcare Whistleblower Statute;

f)  Declare that Defendants SCH and CUMG retaliated against Plaintiffs in violation of the False Claims Act and the Washington State Medicaid Fraud False Claims Act;

g)  Award Plaintiffs economic damages, including consequential damages, in an amount to be proven at trial;

h)  Award Plaintiffs compensatory damages in an amount to be proven at trial;

i)  Award Plaintiffs punitive damages in an amount to be proven at trial;

j)  Award pre-judgment interest and post-judgment interest at the applicable rates, court costs, and attorneys' fees, where applicable; and

k)  Award such other and further relief as this Court may deem just and proper.

DATED this 11th day of December, 2024.

_/s/ Eric L. Siegel_
Eric L. Siegel (Bar No. 427350)
James E. Miller (D.C. Bar No. 1035476)
ERIC SIEGEL LAW, PLLC
888 17th Street NW, Suite 1200
Washington, D.C. 20006
esiegel@ericsiegellaw.com

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

jmiller@ericsiegellaw.com
Phone: (771) 220-6061
Facsimile: (202) 223-6625

*/s/ Brad J. Moore*
Brad J. Moore WSBA #21802
STRITMATTER KESSLER KOEHLER MOORE
3600 15th Avenue West, #300
Seattle, WA98119
Tel: 206.448.1777
Fax: 206.728.2131
brad@stritmatter.com
*Counsel for Plaintiffs*

ERIC SIEGEL LAW, PLLC
888 17TH Street, N.W., Washington, D.C. 20006
Tel: 771-220-6116

1

**CERTIFICATE OF SERVICE**

2         I hereby certify that on this 11th of December 2024, a true and correct copy of the foregoing

3   was served by electronic case filing on the following:

4                                                Jeffrey B. Coopersmith, WSBA No. 30954
                                                 Kevin C. Baumgardner, WSBA No. 14263
5                                                Maia R. Robbins, WSBA No. 54451
                                                 Mark T. Rutherford, WSBA No. 57519
6                                                Renee M. Howard, WSBA No. 38644
                                                 CORR CRONIN LLP
7                                                1015 Second Avenue, Floor 10
                                                 Seattle, WA  98104-1001
8                                                Ph: (206) 625-8600
                                                 jcoopersmith@corrcronin.com
9                                                kbaumgardner@corrcronin.com
                                                 mrobbins@corrcronin.com
10                                               mrutherford@corrcronin.com
                                                 rhoward@corrcronin.com
11
                                                 *Attorneys for Defendant Seattle Children's*
12                                               *Hospital and Jeffrey G. Ojemann, M.D.*

13                                               Bret S. Simmons, WSBA No. 25558
14                                               Melissa Nelson, WSBA No. 17439
                                                 SIMMONS SWEENEY FREIMUND SMITH
15                                               TARDIF PLLC
                                                 1223 Commercial Street
16                                               Bellingham, WA 98225
                                                 Ph: (360) 752-2000
17                                               bret@ssslawgroup.com
                                                 melissa@ssslawgroup.com
18                                               *Attorneys for Defendants CUMG, Browd,*
                                                 *Perkins, UWP, Esselman, and Kinney*
19

20

21                                                 */s/  Eric L. Siegel*
                                                 Eric L. Siegel
22

23

24

SECOND AMENDED COMPLAINT - 58